## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BARBARA SCHROEDER,** | : | **Civil No. 3:16-CV-0464** |
| **Mother of Deceased Plaintiff,** | : | |
| **Sharon Schroeder,** | : | |
| **Plaintiff,** | : | |
| | : | **(Judge Mariani)** |
| **v.** | : | |
| | : | **(Chief Magistrate Judge Schwab)** |
| **NANCY A. BERRYHILL[1]** | : | |
| **ACTING COMMISSIONER** | : | |
| **OF SOCIAL SECURITY** | : | |
| **Defendant.** | : | |

## REPORT AND RECOMMENDATION

### I.     Introduction.

The plaintiff is Barbara Schroeder, mother of Sharon Schroeder ("Ms. Schroeder").  The plaintiff seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claims of her daughter, who died during the course of this case, for Disability Insurance Benefits and Supplemental Security Income under Titles II and XVI of the Social Security Act.  We have jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3).

This matter has been referred to the undersigned United States Magistrate Judge to prepare a report and recommended disposition pursuant to the provisions of 28 U.S.C. § 636(b) and Fed.R.Civ.P. 72(b).  For the reasons expressed herein,

---

[1]  In accordance with Fed.R.Civ.P. 25(d) and 42 U.S.C. § 405(g), Acting Commissioner Nancy A. Berryhill is automatically substituted as the named defendant in place of the former Commissioner of Social Security.

the final decision of the Commissioner of Social Security is not supported by substantial evidence. Accordingly, we recommend that the final decision of the Commissioner denying Ms. Schroeder's claims be **VACATED** and this case be **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g).

## II. Procedural History.

On October 18, 2012, Ms. Schroeder filed an application for disability insurance benefits and an application for supplemental security income benefits. *Admin. Tr.* at 325–32. She listed the following conditions as limiting her ability to work: bipolar disorder, manic depression, panic attacks, anxiety, chronic obstructive pulmonary disease, peripheral neuropathy, kidney problems, and a sleep disorder. *Id.* at 347. These were not the first applications for benefits that Ms. Schroeder filed; an administrative law judge denied Ms. Schroeder's earlier applications on August 3, 2012. *Id.* at 258–72. Given that earlier decision, the parties agree that the alleged onset date here is August 4, 2012.[2]

---

[2] Although at one point, Ms. Schroeder's counsel requested to amend the onset date for the current applications to December 25, 2011, *Admin. Tr.* at 342, counsel later withdrew that request and agreed that given the prior decision, the onset date here is August 4, 2012, *id.* at 176.

After the Commissioner denied Ms. Schroeder's claims at the initial level of administrative review, Ms. Schroeder requested an administrative hearing. *Id*. at 285. On February 25, 2014, with the assistance of counsel, she testified at a hearing before Administrative Law Judge (ALJ) William Kurlander. *Id*. at 171–226.

The ALJ determined that Ms. Schroeder was not disabled within the meaning of the Social Security Act from August 4, 2012, through the date of his decision on June 5, 2014, and so he denied Ms. Schroeder's applications for benefits. *Id*. at 156–70. Ms. Schroeder appealed the ALJ's decision to the Appeals Counsel, which denied her request for review on January 19, 2016. *Id*. at 1–7.[3]

---

[3] The Appeals Council stated that it looked at evidence from Moses Taylor Hospital that post-dated the ALJ's decision. *Admin. Tr*. at 2. But it informed Ms. Schroeder that since that evidence concerned a later time, "it does not affect the decision about whether you were disabled beginning on or before June 5, 2014." *Id*. And it advised Ms. Schroeder that if she wanted it to consider whether she was disabled after June 5, 2014, she must file a new claim. *Id*. "Evidence submitted after the administrative law judge's decision cannot be used to argue that the administrative law judge's decision is not supported by substantial evidence." *Sturges v. Colvin*, No. 3:12-CV-01633, 2014 WL 1682021, at *4 n. 12 (M.D. Pa. Apr. 28, 2014) (citing *Matthews v. Apfel,* 239 F.3d 589, 594–95 (3d Cir. 2001)). Such evidence can be considered only to determine whether to remand under Sentence Six of 42 U.S.C. § 405(g). *Id*. Here, neither party argues for a remand under Sentence Six. In fact, neither party even mentions the additional evidence presented to the Appeals Council. Thus, we do not consider the evidence presented to the Appeals Council. We do note, however, that while some of that evidence is medical records pertaining to Ms. Schroeder, much of it does not even pertain to Ms. Schroeder. Rather, there are more than 100 pages of medical

This makes the ALJ's decision the final decision of the Commissioner subject to judicial review by this Court.

In March of 2016, Ms. Schroeder initiated this action by filing a complaint claiming that the ALJ's decision is not supported by substantial evidence and contains errors of law. *Doc. 1* at 3. She requested that the Court reverse the ALJ's decision and award her benefits, or, in the alternative, remand the case to the Commissioner for a new hearing. *Id.* The Commissioner filed an answer and a certified transcript of the administrative proceedings. *Docs. 7, 8.* After Ms. Schroeder died on April 4, 2016, her mother was substituted as the plaintiff. *See Doc. 12* at 1 and *Doc. 15.* The parties have filed briefs, and this matter is ripe for decision. *Docs. 17, 18, 21.*

## III. Legal Standards.

### A. Substantial Evidence Review—the Role of This Court.

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether substantial evidence supports the findings of the final decision-maker. *See* 42

---

records of a Melissa Melko. *See Admin. Tr.* at 8–132. There is no basis to conclude that Ms. Schroeder used the name Melissa Melko given that the date of birth on Melko's records does not match Ms. Schroeder's date of birth. Rather, it appears that Melko's records were filed in this case in error.

U.S.C. §§ 405(g), 1383(c)(3); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200

(3d Cir. 2008); *Ficca v. Astrue*, 901 F.Supp.2d 533, 536 (M.D. Pa. 2012).

Substantial evidence "does not mean a large or considerable amount of evidence,

but rather 'such relevant evidence as a reasonable mind might accept as adequate

to support a conclusion.'" *Pierce v. Underwood,* 487 U.S. 552, 565 (1988)

(quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

Substantial evidence is less than a preponderance of the evidence but more than a

mere scintilla. *Richardson v. Perales,* 402 U.S. 389, 401 (1971).  A single piece of

evidence is not substantial evidence if the ALJ ignores countervailing evidence or

fails to resolve a conflict created by the evidence. *Mason v. Shalala*, 994 F.2d

1058, 1064 (3d Cir. 1993).  But in an adequately developed factual record,

substantial evidence may be "something less than the weight of the evidence, and

the possibility of drawing two inconsistent conclusions from the evidence does not

prevent [the ALJ's] finding from being supported by substantial evidence."

*Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966).  "In determining if

the Commissioner's decision is supported by substantial evidence the court must

scrutinize the record as a whole." *Leslie v. Barnhart*, 304 F.Supp.2d 623, 627

(M.D. Pa. 2003).  The question before this Court, therefore, is not whether Ms.

Schroeder was disabled, but whether substantial evidence supports the

Commissioner's finding that she was not disabled and the Commissioner correctly applied the relevant law. *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.") (alterations omitted); *Burton v. Schweiker*, 512 F.Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); *Ficca*, 901 F.Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

### B.  Initial Burdens of Proof, Persuasion, and Articulation for the ALJ.

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other

substantial gainful activity that exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1505(a), 416.905(a).

To receive disability insurance benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. § 423(a); 20 C.F.R. § 404.131(a).[4] Unlike with disability insurance benefits under Title II of the Social Security Act, "[i]nsured status is irrelevant in determining a claimant's eligibility for supplemental security income benefits" under Title XVI of the Social Security Act. *Snyder v. Colvin*, No. 3:16-CV-01689, 2017 WL 1078330, at *1 (M.D. Pa. Mar. 22, 2017). Supplemental Security Income "is a federal income supplement program funded by general tax revenues (not social security taxes)" "designed to help aged, blind or other disabled individuals who have little or no income." *Id.*

---

[4] "Disability insurance benefits are paid to an individual if that individual is disabled and 'insured,' that is, the individual has worked long enough and paid social security taxes." *Jury v. Colvin*, No. 3:12-CV-2002, 2014 WL 1028439, at *1 n.5 (M.D. Pa. Mar. 14, 2014) (citing 42 U.S.C. §§ 415(a), 416(i)(1)). "The last date that an individual meets the requirements of being insured is commonly referred to as the 'date last insured.'" *Id.* (citing 42 U.S.C. § 416(i)(2)). Here, the ALJ determined that Ms. Schroeder met the insured status requirements through December 31, 2013. *Admin. Tr.* at 156.

In determining whether the claimant is disabled, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §§ 404.1520(a), 416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience, and residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

Between steps three and four, the ALJ must also assess a claimant's RFC. RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); *see also* 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairment identified by the ALJ at step two of his or her analysis. 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2).

At steps one through four, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents

him or her from engaging in any of his or her past relevant work. 42 U.S.C.

§§ 423(d)(5), 1382c(a)(3)(H)(i) (incorporating 42 U.S.C. § 423(d)(5) by

reference); 20 C.F.R. §§ 404.1512, 416.912;[5] *Mason*, 994 F.2d at 1064. Once the

claimant meets this burden, the burden shifts to the Commissioner at step five to

show that jobs exist in significant number in the national economy that the

claimant could perform and that are consistent with the claimant's age, education,

work experience, and RFC. 20 C.F.R. §§ 404.1512(f), 416.912(f); *Mason*, 994 F.2d

at 1064.

The ALJ's disability determination must also meet certain basic substantive

requisites. Most significant among these legal benchmarks is a requirement that

the ALJ adequately explain the legal and factual basis for the disability

determination. Thus, in order to facilitate review of the decision under the

substantial evidence standard, the ALJ's decision must provide "a clear and

satisfactory explication of the basis on which" his or her decision rests. *Cotter v.*

*Harris*, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be

---

[5] 20 C.F.R. §§ 404.1512 and 416.912 were amended after the ALJ issued his
decision in this case. Subsection (f) of these regulations in effect on the date of the
ALJ's decision was redesignated as section (b)(3) in the most recent version of
these regulations. We cite to the version of these regulations that was effective on
the date of the ALJ's decision, but the outcome in this case would be the same
under the more recent version of these regulations.

resolved, and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. *Id*. at 706–707. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." *Schaudeck v. Comm'r of Soc. Sec. Admin.*, 181 F. 3d 429, 433 (3d Cir. 1999).

## IV. Medical History and Testimony.

### A. Relevant Medical History.

Ms. Schroeder had kidney problems. In late 2011, she went to the emergency room because of severe abdominal pain, and she was diagnosed with "a right proximal ureteral calculus measuring about 1 cm," and "moderate-to-severe hydronephrosis." *Id*. at 407, 433.[6] A stent was placed. *Id*. In February of 2012, a doctor performed a "right-sided ureteroscopy," which showed a "relatively dense 1 cm right proximal ureteral stricture." *Id*. at 405. The doctor treated "two calculi" and left the stent. *Id*. Ms. Schroeder had several additional procedures and stent replacements. *Id*. at 437-96, 533-43, 550-65, 606-10. Her stent was removed on November 8, 2012. *Id*. at 750. In mid-2013, she developed righted flank pain, and had a renal ultrasound, which "demonstrated some significant right-sided

---

[6] Hydronephrosis is swelling of a "kidney due to a backup of urine." *Id*. at 382.

hydronephrosis" as well as "some cortical loss." *Id*. at 745. It was noted that

"[s]he may require retrograde pyelogram and possibly an intervention such as

balloon dilation or repeat laser incision with a stent." *Id*. at 746. A scan on July 22,

2013, showed a "3 mm calculus in the lower pole calyx of the right kidney" and a

"[m]oderate degree of right-sided hydronephrosis with abrupt narrowing [at] the

level of the renal pelvis," which suggested "a chronic right ureteropelvic junction

obstruction." *Id*. at 865–67. Ms. Schroeder also had COPD and peripheral

neuropathy. *Id*. at 453–65 & 472–77, 695, 700, 740–44.[7]

In addition to her physical problems, Ms. Schroeder had mental health

problems. In July of 2011, she reported depression, anxiety, mood swings, and

that in the last six months, her symptoms had increased and she did not want to

leave the house or go anywhere alone. *Id*. at 814. A mental status exam recorded

that her mood was despairing, irritable, self-contemptuous, depressed, and angry,

and her affect was constricted and blunted. *Id*. at 822. She was diagnosed with

bipolar disorder and post-traumatic stress disorder. *Id*. at 824. Her Global

Assessment of Functioning ("GAF") score was recorded as 40–45. *Id*. She was

referred to psychotherapy. *Id*. at 826. In October of 2011, Dr. Cespon conducted a

---

[7] Because Ms. Schroeder's claims in this case center around the ALJ's treatment
of her mental health impairments and her credibility, we do not recount in detail
the medical records relating to her physical impairments.

11

mental status exam, and he noted that Ms. Schroeder's mood was anxious and her affect was constricted. *Id*. at 682.

On November 7, 2011, Ms. Schroeder shared her history with her therapist and discussed her fears. *Id*. at 679. She reported that she had been drinking often, but she recognized that her drinking was problematic and she set a goal not to drink during the next week. *Id*. A licensed social worker recorded that Ms. Schroeder's speech was pressured and her mood anxious, but she appeared well groomed; she was alert, oriented, and cooperative; her affect was appropriate; her thought process logical; her thought content and perception within in normal limits; her judgement intact; and suicidal and homicidal ideations were absent. *Id*. She had weekly therapy sessions from November 7, 2011, to December, 12, 2011. *Id*. at 675–79. The licensed social worker recorded Ms. Schroeder's presentation as normal. *Id*. at 675–78. On December 12, 2011, Ms. Schroeder shared with her therapist that "she joined a local women's gym and went today, and that she also walked to Dunkin Donuts twice this week." *Id*. at 675. She also had a setback, however, in that she drank with a friend. *Id*.

In January of 2012, in connection with her mental health treatment plan, Ms. Schroeder identified her problems: "Everything is sad to me – I cry a lot. Daily fears of leaving the house alone, Mood swings, panic attacks, alcohol abuse." *Id*. at

629.  On January 3, 2012, she reported that she maintained a positive attitude despite her hospitalization for a kidney infection the prior week, and she had gone to the gym three times during the previous week and walked to Dunkin Donuts with regularity. *Id*. at 674.  She added that "[s]he would like to get involved in additional activities and wants to start taking the bus so that she could be involved in group therapy." *Id*.  On January 9, 2012, Ms. Schroeder "discussed her poor sleep habits, which include staying in her bedroom all day." *Id*. at 672.  After she told her therapist that she did not go in her living room often because she did not like the way it looks, her therapist helped her brainstorm ideas to redecorate her living room so she would feel more comfortable there. *Id*.  They also discussed "positive self-talk" as Ms. Schroeder was having racing thoughts at night and difficulty falling back to sleep. *Id*.

After a mental status exam on January 12, 2012, Dr. Falgowski recorded that Ms. Schroeder's mood was depressed and labile and her affect constricted. *Id*. at 670.  On January 23, 2012, Ms. Schroeder reported that rearranging her living room had made her feel better and resulted in her spending time outside of her bedroom. *Id*. at 669.  She also expressed that she had been doing yoga regularly, which made her feel calmer, that she would like to socialize more, and that she planned to join a local gym. *Id*.

On January 30, 2012, Ms. Schroeder described continuing "to experience some difficulty when out in public, as evidenced by a panic attack occurring on her walk to the store last week." *Id*. at 668.  In the next few weeks, she reported that she had difficulty sleeping at night because of racing thoughts, that she had a poor mood because of a lung infection after an operation, that her mood was unstable, that she got agitated very quickly, and that she experienced "high anxiety." *Id*. at 664, 666–67.  She also conveyed that she wanted to get involved in more activities, but she had difficulty getting started because of her fears. *Id*. at 664.  In connection with a mental status exam on February 27, 2012, Dr. Cespon noted that Ms. Schroeder's mood was anxious and her affect constricted. *Id*. at 665.

A treatment plan prepared in March of 2012, recounted that Ms. Schroeder identified "mood instability and that she experiences sadness/irritability approximately 4 days/week (6-7 on SUD scale)"[8] as well as "anxiety/panic attacks when in a public settings." *Id*. at 628.  Ms. Schroeder recognized that alcohol abuse worsened her mood; she had been sober for 90 days and her mood had improved. *Id*.  In mid-March 2012, Ms. Schroeder told her therapist "that she has high anxiety

---

[8]  The SUD (subjective units of distress) scale "is a scale of 0 to 10 'for measuring the subjective intensity of disturbance or distress currently experienced by an individual.'" *Doc. 17* at 12 n.7 (quoting https://en.wikipedia.org/wiki/Subjective_units_of_distress_scale) (last visited October 7, 2016)).  "The individual self assesses where they are on the scale." *Id*.

going into places where there are large crowds, such as busy grocery stores." *Id*. at 662. She feared that others were looking at and talking about her. *Id*. A week later, however, Ms. Schroeder reported that she had been feeling better as of late, she had a decrease in racing thoughts, she was happy that she had been sober for 90 days, and she had been exercising more and maintaining a generally positive attitude. *Id*. at 661. She stated that she definitely felt better than she had three months ago. *Id*.

On April 9, 2012, she recounted that she had gone home to New Jersey twice since her last session and that it went very well. *Id*. at 659. She also reported, however, that she knew that she had gotten off track the last few weeks. *Id*. In connection with a mental status exam on April 9, 2012, Dr. Cespon observed that Ms. Schroeder's mood was anxious and her affect constricted. *Id*. at 660. On April 16, 2012, Ms. Schroeder stated that she had not left her house in the past week and that she feared starting new projects or activities because she would be upset if she did not complete them. *Id*. at 658. In connection with a mental status exam on April 23, 2012, Dr. Falgowski noted that Ms. Schroeder's mood was anxious. *Id*. at 656. In May of 2012, Ms. Schroeder reported that she continued to remain sober, that she had done very well at a family party and felt good about herself, but that she was preoccupied with her weight. *Id*. at 654–55.

In June of 2012, Ms. Schroeder started group therapy. *Id*. at 653. She attended six group sessions from June 4, 2012 to July 16, 2012. *Id*. at 644–45, 647–48, 652–53. She set a long-term goal of volunteering with the elderly. *Id*. at 644. But on July 9, 2012, it was observed that she had not set any new goals "nor were any followed up on." *Id*. at 645.

In July of 2012, Ms. Schroeder reported mood instability, "sadness & irritability approximately 3 days/week (6-7 on SUD scale)," "anxiety attacks when in public places such as the market and doctor's office," and "frustration and 'disgust' over her weight, which lowers her self-esteem and raises [her] insecurity." *Id*. at 626–27. It was noted that she "isolates herself and does not have many people for social support." *Id*. at 627. Ms. Schroeder's progress since the start of treatment was recorded as fair: her mood was better and she was getting out of the house more. *Id*. at 626.

Ms. Schroeder also continued with individual therapy. The progress notes from the therapy sessions document that she had ups and downs. For example, they show Ms. Schroeder obsessed about her weight, abused laxatives, and forced herself to vomit. *Id*. at 649. They also show that in September of 2012, she revealed that she had drank, that she had racing thoughts, and that she was "sleeping a lot, staying in bed, and ha[d] no motivation." *Id*. at 638–39. On

16

September 10, 2012, Ms. Schroeder declared that "[t]hings are just really bad right now." *Id*. at 639.

On November 15, 2012, her therapist observed that Ms. Schroeder had decompensated since her last therapy plan, which was attributed in part to her health issues. *Id*. at 810. On November 12, 2012, she described having bad panic attacks four times a week. *Id*. at 808. Still, on November 19, 2012, she reported that she felt better than she had last Thanksgiving, and she can look at the positives in her life. *Id*. at 807. She hoped to have a job and be able to go out on her own by the following Thanksgiving. *Id*. She displayed "some paranoia when out on walks, as she has some fears that others will harm her." *Id*. On November 26, 2012, she reported "difficulty sleeping the night before appointments/leaving that house." *Id*. at 806.

On January 7, 2013, Ms. Schroeder narrated that she continued to be isolated over the previous month and a half, that her sleep had been terrible, and that she had been without her medications since late December. *Id*. at 805. Two weeks later, she reported increased agitation and that she had been staying up all night due to racing thoughts. *Id*. at 804. Still, she identified going for a walk and going to the store at night with her boyfriend as goals she hoped to achieve. *Id*.

A treatment plan prepared in February of 2013, noted that Ms. Schroeder

was having panic attacks three times a day. *Id*. at 764. And a therapy note from

February 4, 2013, provides:

> Pt. discussed increase in the intensity of panic attacks,
> which she attributes to her boyfriend's father's condition. She
> has been engaging in more activities around the house and feels
> better about herself, but also feels alone in house and worries
> that the worst will happen. She identified that she watches the
> news 3-4 hours daily and believes this triggers fears. Pt hopes
> to replace this behavior w/ a more positive behavior.

*Id*. at 801.

In connection with six mental status exam from June of 2012 until March of

2013, Dr. Cespon observed that Ms. Schroeder's mood was depressed and anxious

and her affect constricted. *Id*. at 634. 636. 651, 794, 803, 809. Dr. Cespon also

noted on several occasions that Ms. Schroeder disclosed that she was having side

effects from her medications including agitation and weight gain. *Id*. at 794, 803.

In January of 2013, he noted that she revealed that she was sleeping only three

hours, and the Ambien was not working. *Id*.

In a therapy session in March of 2013, Ms. Schroeder identified a

campground in New York as a safe place, and she stated that she felt at peace in

nature. *Id*. at 797. She and her boyfriend hoped to go camping soon. *Id*. On March

11, 2013, she informed her therapist that she learned that she continues to have

kidney issues, which reinforced her depressed mood. *Id*. at 796. The following

week, she expressed that she hoped to start going out with her boyfriend in the

evenings, starting once a week and working up to four times a week. *Id*. at 795.

She also hoped to start going on walks with him so that she would feel more

comfortable in the neighborhood. *Id*.

A therapy note from March 25, 2013, narrated that Ms. Schroeder "went out

one night over the last week to ACME and reports that she was comfortable." *Id*. at

793. She hoped to go out at night two times the following week to increase her

socialization. *Id*. The following week she reported that she had forced herself to

go out two times during the past week. *Id*. at 792. She also revealed that she does

not take Seroquel on nights before she has to go out because it causes drowsiness.

*Id*. A couple of weeks later, she explained that she did not take Seroquel on

Sunday nights because it caused her to be too groggy to function on Mondays, and

she did not take it some other nights as well because it led to lack of energy and

lack of motivation. *Id*. at 791. She also reported an increase in racing thoughts. *Id*.

A mental status exam conducted in April of 2013 was normal. *Id*. at 790.

Dr. Cespon noted, however, that Ms. Schroeder reported side effects from her

medications including grogginess. *Id*. On April 22, 2013, Ms. Schroeder discussed

her "anxiety over riding in cars, which prevents her from driving and achieving

independence." *Id*. at 789. She identified her goals as socializing more, riding a bus, and working toward independence. *Id*. On May 6, 2013, she reported that her panic attacks had decreased to 4-5 a week, and she stated that she was "definitely doing better now than before." *Id*. at 788. In connection with a mental status exam in June, Dr. Cespon recorded that Ms. Schroeder's mood was both euthymic and anxious and her affect was constricted. *Id*. at 786. He also noted that Ms. Schroeder reported side effects from her medications. *Id*. On June 24, 2013, Ms. Schroeder expressed that she would like to return to work someday. *Id*. at 785.

In August of 2013, Dr. Cespon recorded that Ms. Schroeder's mood was depressed and her affect constricted. *Id*. at 781. He also noted that Ms. Schroeder reported side effects from her mediations including tiredness, fatigue, and restless legs. *Id*. The note from her August 5, 2013, session provides:

> Pt has been experiencing an increase in depression (8-9 SUDS) over the last several weeks. She has been eating one meal daily, staying in bed all day, and has lost interest in all of her normal hobbies. She has lacked motivation and hopes that regularity w/therapy will help.

*Id*. at 784. On August 12, 2013, she reported that "Today was a good day." *Id*. at 782. It was the first day that she woke up early, and she accomplished a lot. *Id*. Still, she reported having "sustained episodes of depression." *Id*. She informed her therapist that she rode her exercise bike one time that week and that she prepared

food multiple times. *Id*. A week later, she reported having more bad days than good days, and she felt anti-social and less engaged with other people. *Id*. at 780. On September 3, 2013, her therapist helped her develop strategies for dealing with her anxiety about going places like Walmart and ACME. *Id*. at 779. Ms. Schroeder observed that she "did more this summer than last." *Id*.

In a treatment plan from November of 2013, it was noted that Ms. Schroeder was more depressed, she lost interest in hobbies, and she decreased completing activities of daily living. *Id*. at 759. On November 28, 2013, she disclosed having panic attacks sometimes two to three times a day. *Id*. at 772. A treatment plan prepared in December of 2013, recorded Ms. Schroeder's "Problem(s): Current State of Change:"

> Daily anxiety; scared; crying with panic attacks most days all day. Fear of driving or taking the bus. Past traumatic experience[.] Feels abandon[ed] by mother from a child until present. 2005 lost since [sic] of self when lost everything because of a DUI. Dad's death. Stage of contemplation: has a desire to change[.] SUD score 9 VOC score 0.

*Id*. at 756. On December 9, 2013, Ms. Schroeder questioned whether her medication was working as she was still getting panic attacks. *Id*. at 769.

In connection with a mental status exam in early December 2013, Dr. Rackow noted that Ms. Schroeder's mood was depressed and anxious. *Id*. at 770. He also noted that Seroquel was too sedating for her, and he started her on a low

dose of Tegretol. *Id.* A month later, Dr. Rackow did not record anything unusual about Ms. Schroeder's mental status exam, but he increased the dose of Tegretol because Ms. Schroeder still reported racing thoughts and trouble sleeping. *Id.* at 767.

The psychotherapy treatment plans from Cozer Chester Medical Center logged Ms. Schroeder's GAF score as 40–45 throughout her treatment. *Id.* at 627–29, 756, 758-59, 761, 763, 765.

### B. Ms. Schroeder's Function Report.

In a function report, Ms. Schroeder reported that she lived alone in an apartment. *Admin. Tr.* at 365. She described what she did during the day as sitting in bed and watching television. *Id.* at 366. She recounted that she fed her cats, but she also reported that her landlord helped with the cats by feeding them, by buying cat food, and by changing their litter box and water. *Id.* Although she checked the box indicating that she had no problem with personal care, she also checked the box indicating that she needed reminders to take care of her personal needs and grooming, and she reported that her landlord told her to shower and do her hair. *Id.* at 366–67.

Ms. Schroeder reported that she prepared her own meals of frozen dinners and sandwiches weekly. *Id*. at 367. She did "little cleaning around the house," and she needed help or encouragement to do things such as sweeping and dusting because she had "no desire at times" and she did not feel well. *Id*.

She usually went outside once a week to go to the doctor on Mondays, when her friend was off work and took her. *Id*. at 368. She reported that she could not go out alone: she tried, but she usually had a panic attack or feared that she would have a panic attack. *Id*. She was afraid to drive. *Id*. She recorded that she shopped in stores for food for five to ten minutes. *Id*. According to Ms. Schroeder, she did not have any problem handling money. *Id*. at 368–69. Her hobbies were watching television and reading. *Id*. at 369.

Ms. Schroeder identified her social activities as talking on the phone to her landlord three to four times a week and going to the doctor on Mondays. *Id*. She reported that her illness affected her ability to lift, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, concentrate, and get along with others. *Id*. at 370. She also reported that she forgot things and she had a fear of being around others. *Id*. According to Ms. Schroeder, her medications caused side effects— dizziness, tiredness, and weight gain. *Id*. at 372.

### C. Function Report by Dominic Palermo, Jr.

Dominic Palermo, Jr., who identified himself as Ms. Schroeder's friend/landlord completed a third-party function report. *Admin. Tr.* at 385–92. He reported that he saw Ms. Schroeder daily to help her with things. *Id*. at 385. According to Mr. Palermo, Ms. Schroeder stayed in bed watching television most of the day except on Mondays when he took her to the doctor. *Id*. at 386. He reported that she tried to take care of her two cats, but she relied on him to help. *Id*. He made sure the cats were fed, and he cleaned and changed their litter. *Id*.

According to Mr. Palermo, Ms. Schroeder tended not to take care of herself because of her depression: she did not shower every day, and she did not take time to do her hair. *Id*. He cooked for her and picked up food. *Id*. He reported that she was afraid to go out and do things by herself. *Id*. She scheduled her appointments on his day off, and unless he took her, she did not go. *Id*. Mr. Palermo also reported that Ms. Schroeder had a hard time sleeping without medication, and she sometimes called him in the middle of the night in a panic asking him to come stay with her because she was afraid of being alone. *Id*. at 386.

According to Mr. Palermo, he had to remind Ms. Schroeder to take her medication and to shower. *Id*. at 387. He reported that Ms. Schroeder did not prepare her own meals, and she did nothing around the house. *Id*. He stated that

she did not like to go outside by herself; she was afraid to be in social situations, and she would panic. *Id*. at 388. He also said that she did not drive because she feared other people on the road and she feared having a panic attack. *Id*. According to Mr. Palermo, Ms. Schroeder went outside only for appointments and to the store—when he took her. *Id*. She would go to stores only if he took her, and she did not like to be out long. *Id*. He identified Ms. Schroeder's hobbies as watching television and her cats. *Id*. at 389. Mr. Palermo reported that Ms. Schroeder did not spend time with others, and the only place that she went on a regular basis was to her doctor appointments. *Id*.

### D. Testimony at the Hearing before the ALJ.

At the hearing before the ALJ on February 25, 2014, two witnesses testified—Ms. Schroeder and vocational expert (VE) Agnes Klozinski Gallan.

#### 1. Ms. Schroeder's Testimony.

Ms. Schroeder, who was 44 years old at the time of the hearing, testified that she lived alone, but her landlord helped her "tremendously." *Admin. Tr.* at 186. After she testified about her prior employment, the ALJ asked her how she had been supporting herself since she stopped working, and she answered that her

mother and her landlord helped her. *Id*. at 186–88.  She testified that she was "[a] little bit" romantically involved with her landlord. *Id*. at 190.

Ms. Schroeder had a driver's license, but she did not drive because she was afraid to do so. *Id*. at 189.  When asked if she had left the state in the last year and half, she testified that she went to see her mother in New Jersey, and her landlord, who is a good friend, took her. *Id*.

In response to the ALJ's question about what she does for exercise, Ms. Schroeder testified that she didn't really do anything at the moment for exercise and that she was not active at all. *Id*.  She also testified about when she last exercised:

> Q:  All right.  When did you last do something for exercise?
> A: Maybe about six, seven months ago.  I tried in my house to do some exercising, because I'm concerned with my weight gain.
> Q:  Okay.
> A:  But I really didn't stick with it.  I didn't feel good after.  I'm just tired all the time.
> . . .
> Q:  Ma'am, do you have an exercise bike at home?
> A:  I do.
> Q:  Okay.
> A:  It's actually my landlord's, but I have use of it if I need it.

*Id*. at 189–90.

Ms. Schroeder testified that she had not been camping in the last year and half. *Id*. at 190.  She further testified that in the last year and a half, she had gone to

the Poconos, where her landlord owns a house, five or six times for two or three days at a time. *Id*. at 190–91.

In response to the ALJ's question about whether she shopped for groceries, Ms. Schroeder testified:

> Q: Okay. Ma'am, do you shop for groceries at all?
> A: I try to, but I go with – on Mondays; that's the only time I really go out of my house, is because my landlord's off from work that day, and he'll try to get me to go grocery shopping. So I do try to go with him on Mondays, but if it's too crowded I leave right away. He does do most of my grocery shopping.
> . . .
> Q: Okay. So ma'am, when is the last time you were in a supermarket?
> A: Oh, maybe about a month ago.

*Id*. at 191–92. She also testified that she and her landlord, Dominic, went to the grocery store "[a]s early as possible," when nobody was there. *Id*. at 206. They would go around 8:30 or 9:00 a.m. after her appointment with her therapist. *Id*. But Ms. Schroeder would not go into the store if the parking lot was full. *Id*.

Ms. Schroeder testified that the last time she took public transportation was in 2009. *Id*. at 192. Her landlord took a day off work to drive her to the hearing. *Id*.

The ALJ asked Ms. Schroeder if in the last year and half, she and her landlord had gone out to a restaurant, to a movie, to the park, or "to walk along the river or anything." *Id*. at 193. Ms. Schroeder responded that they had gone to a

restaurant "maybe once or twice, A Denny's or something" after her psychologist appointment. *Id*. She also testified that she had not had her haircut in a long time, but she had gone to for a haircut about four or five months ago. *Id*. Her landlord took her. *Id*.

Ms. Schroeder smoked. *Id*. at 195. Although she had tried to quit smoking, she had not quit because it was very hard to do. *Id*. at 211. Her landlord got her cigarettes at the Sunoco station. *Id*. She responded affirmatively to the ALJ's question about whether she had ever been inside the minimart at the Sunoco station. *Id*.

The ALJ asked her when she last had "a problem with incontinence, an accident, urinated in" her clothes. *Id*. Ms. Schroeder responded: "Actually this morning, because I get very nervous when I have to go out, and I feel like I want to vomit. And when I - - it made me urinate when I felt like - - well, I was trying to vomit. I was coughing a lot." *Id*. at 195–96. The ALJ asked her if she wears depends, and she responded that she does not, but she may have to eventually. *Id*. at 196.

Ms. Schroeder described her depression: "There's sadness, mood swings. I'm always in my bedroom. I don't leave the house. I isolate myself a lot. I have a hard time remembering things. Everytime I go anywhere it's always got to be

with Dominic [phonetic], my landlord. I don't really do anything on my own at all." *Id*. at 197–98. And she explained that on bad days, she stayed in bed all day, she did not take a shower, she did not cook, she was very sad and cried, her mind raced, and she worried about everything. *Id*. at 198. She testified that her mind raced every night, and the medications did not seem to help her sleep. *Id*. at 198– 99. She explained that it was very hard for her to get to sleep "especially when there's something going on the next day; a doctor's appointment or anything." *Id*. at 199. According to Ms. Schroeder, she never slept through the night. *Id*. She would get up because she felt the urge to urinate two or three times a night. *Id*. She also testified that during the day, she urinated or felt the urge to urinate six, seven, or more times a day. *Id*.

Ms. Schroeder also testified about her anxiety: she had panic attacks and felt like she could not breathe. *Id*. at 200. She described the variability in the frequency of her panic attacks:

> Q: And how often are you having the panic attacks at this
> point?
> A: These are - - panic attacks are daily.
> Q: Now there are times when you - - you know, when you look
> through the records; they went from daily to maybe, with
> different medication changes three, four times a week.
> A: Yes.
> Q: So there is an ebb and flow, kind of, to the panic attacks
> also?
> A: Yes, it varies. It really does

Q:  Now is it - - how long have you had them on a daily basis? You said currently: how far back does that go?
A: I've - - for the panic attacks, a long time now, like daily on through about the last six months it's been going on.
Q:  All right, and then prior to that, after a medication change it was less for a little while?
A:  Sometimes, yeah; sometimes I wouldn't get them every single day.

*Id*. at 200–01.  The panic attacks lasted from 20 to 40 minutes. *Id*. at 201.  When she had a panic attack, she would call her landlord and tell him that she could not breathe, that she was all by herself, and that she was scared. *Id*.  He would put her on speakerphone and talk to her while he was working as a truck driver. *Id*.  She called him five to seven times a day. *Id*.

Ms. Schroeder testified that she saw her psychiatrist, Dr. Cespon, once a month. *Id*.  He had her on Effexor XR, Latuda, Klonopin, and Ambien. *Id*.  She was also on Seroquel, but Dr. Cespon took her off that because she could not function—she was like a zombie. *Id*. at 196–97.  She testified that her current medications caused weight gain, and she gained 45 pounds, which really bothered her. *Id*. at 197.  They also caused her to be sluggish and to have no energy. *Id*. at 201.

Ms. Schroeder testified that her therapist encouraged her to get out of the house and to go out and do more things on her own. *Id*. at 208.  In response to an

inquiry about whether she tried to do so or she just "talks a good game with the

therapist," she explained:

> A:  I tell them that I'm going to try, that I'm going to - -
> because they always tell me don't say that, don't commit to
> three times a week, you know, that I'm going to go do
> something: you know, do slowly, maybe, you know, one day
> you're going to - - you know,  make plans to take a walk to the
> store, or I was sitting outside with my cats in front of my house.
> I would do that.  But I never - - I always wait for Dominic to
> take me someplace.
> Q:  So when you talk about going out two, three times a week -
> -
> A:  I don't go out two, three times a week on my own.
> Q:  So that's really just telling them you're going to try to do
> that?
> A:  Yeah.  I don't do it, though, at all.
> Q:  So you're telling them the truth; or you just don't want them
> to what?
> A:  No, they - - Sean, the one therapist I saw, he knows that,
> when I didn't do it.  Because he would ask me.  Sometimes I
> did.  I tried to take a walk, and I'd come right back home
> because I'm just nervous being out in public by myself, or even
> taking a walk, I'm just afraid of other people around me.

*Id*. at 208–09.  She also testified about her paranoia: she thought something was

going to happen, she was going to get hurt somehow, or someone was going to

break into her house when she was home. *Id*. at 209.  Her racing thoughts were

about what she was feeling and what she was going to do. *Id*.  She also explained

that she was constantly thinking about whether she was ever going to feel better

because she did not want to be like she was. *Id*.

Ms. Schroeder reiterated that her landlord did everything for her including feeding her cats. *Id*. at 210. She testified that he did the laundry and a lot of the cooking, and she was very dependent on him. *Id*. According to Ms. Schroeder, when she was in a depressed mood, she did not do anything. *Id*.

Ms. Schroeder also testified about her kidney problems and neuropathy as well as her diagnosis of COPD. *Id*. at 202–07, 211.[9]

### 2. VE Gallan's Testimony.

VE Gallan described Ms. Schroeder's past work as an administrative assistant, as a sales representative, and as a customer service representative. *Id*. at 213–19. The ALJ then asked her whether there was any other work a hypothetical individual could perform if that individual had the same vocational profile as Ms. Schroeder and the RFC to perform work at the light exertional level with the following limitations: work limited to simple, routine tasks; no interaction with the general public; no more than occasional interaction with coworkers and supervisors; no more than frequent exposure to atmospheric irritants, such as dust, fumes, odors, and gases; no more than frequent exposure to wetness and

---

[9] Because Ms. Schroeder's claims in this case center on the ALJ's treatment of her mental health impairments and her credibility, we do not recount the details of her testimony regarding her physical impairments.

temperature extremes; no pushing and pulling with the bilateral lower extremities; no more than occasional postural activity, but no crawling, kneeling, or climbing; and there is sit/stand option. *Id*. at 220. VE Gallan testified that such an individual could do the jobs of a bench assembler, mail sorter, and office helper. *Id*. at 221–22. VE Gallan confirmed that her testimony was consistent with the Dictionary of Occupational Titles except as to the sit/stand option as to which she was relying on her own personal observations in analyzing jobs in the past. *Id*. at 222.

Ms. Schroeder's counsel then asked VE Gallan whether there was work in the national economy for the same hypothetical individual described by the ALJ but with the additional limitation that she is only able to get out of the house once a week with someone accompanying her. *Id*. VE Gallan responded in the negative. *Id*. Counsel then asked VE Gallan whether the same hypothetical individual described by the ALJ but with the additional limitation that she has panic attacks lasting 20 to 40 minutes three to five times a day, during which she cannot work, would be able to do the jobs previously identified. *Id*. at 223. VE Gallan again responded in the negative. *Id*.

In another hypothetical, counsel asked whether the same hypothetical individual who had to leave her work station four or five times for five to ten minutes at a time because of either the need to or the urge to urinate, would be able

to work at the pace and get the amount of work done that a normal employer in the national economy would require. *Id*. at 223–24. VE Gallan responded that some people can work faster and make up for what they missed, but if the hypothetical individual could not do that, then she would not be able to maintain competitive employment. *Id*. at 224. Counsel then asked VE Gallan to assume that because of medication side effect such as lethargy and fatigue, the hypothetical individual could not necessarily perform at a pace to make up the work missed. *Id*. VE Gallan responded that if the individual could not "complete 80 percent of productivity she would not be able to maintain competitive employment." *Id*.

## V. The ALJ's Decision Denying Ms. Schroeder's Claims.

On June 5, 2014, the ALJ denied Ms. Schroeder's claims for benefits. Applying the sequential-evaluation process, the ALJ determined that Ms. Schroeder was not disabled within the meaning of the Social Security Act.

At step one of the sequential-evaluation process, the ALJ found that Ms. Schroeder had not engaged in substantial gainful activity since her alleged onset date of August 4, 2012. *Admin. Tr.* at 158.

At step two of the sequential-evaluation process, the ALJ found that Ms. Schroeder had the following severe impairments: bipolar disorder, post-traumatic

stress disorder, peripheral neuropathy, chronic obstructive pulmonary disease, and kidney disease. *Id*.

At step three of the sequential-evaluation process, the ALJ found that Ms. Schroeder did not have any impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id*. at 159–61. More specifically, the ALJ discussed Listings 3.02, 6.00, 11.14, 12.04, and 12.06, and determined that Ms. Schroeder did not meet those Listings. *Id*. Notably, at this step, the ALJ discussed Ms. Schroeder's mental impairments and GAF scores:

> The claimant additionally alleges disability because of a mental impairment. The record indicates that the claimant has a history of anxiety. Her consumption of alcohol was also of concern. She began treating at the Crozer Community Hospital mental health division with psychiatrist, Ruben Cespon, MD, and therapist, Shawn Beckowski, LSW for diagnosed bipolar II disorder, mixed, severe with paranoia and post traumatic stress disorder. The global assessment of functioning scale score of 40-45, as set by diagnosing psychiatrist, Edward Urban, MD in 2011, is not noted to have changed, although the mental status examinations are essentially benign with little more than an anxious and/or depressed mood and circumstantial thought processes noted on occasion in treatment records. It is noted that GAF assessments are highly subjective appraisals that rely primarily on an individual's own description of his functioning level, and are just one factor to be considered in the evaluation of a claimant's functioning. According[ly], I do not place significant weight on numerical scores when they are not supported by the evidentiary record, and fail to consider medical improvement following appropriate treatment, as is

35

demonstrated in this case. Psychotropic medication, such as
Effexor, Risperdal, Seroquel, Klonopin, and/or Vistaril were
prescribed to good effect with medications adjusted as deemed
necessary in response to side effects, of which few were
reported, and/or exacerbation of symptoms.

*Id.* at 159–60 (citations to the record omitted). At this step, the ALJ also found that

Ms. Schroeder had moderate restrictions in her activities of daily living, moderate

difficulties in social functioning, moderate difficulties in concentration,

persistence, or pace, and no episodes of decompensation of an extended duration.

*Id.* at 160–61.

Between steps three and four of the sequential-evaluation process, the ALJ

assessed Ms. Schroeder's RFC. He found that Ms. Schroeder had the RFC to

perform light work but with the following limitations:

[n]o more than occasional postural activity, but no crawling,
kneeling, or climbing (because of pain and periodic
incontinence as described); alternating sitting and standing (by
this I mean, if the claimant is sitting and experiences back or
other pain, he/she can stand and stretch in place to alleviate
his/her pain and continue work in the standing position, if
desired. Similarly, if the claimant is standing and experiences
back or other pain, he/she can sit down to alleviate his/her pain
and continue working in a sitting position, if desired), no
pushing or pulling with the bilateral lower extremities; no more
than frequent exposure to atmospheric irritants, such as dust,
fumes, odors, and gases; no more than frequent exposure to
wetness and temperature extremes, nor more than occasional
interaction with coworkers and supervisors and no interaction
with the general public. She is limited to simple, routine tasks.

*Id.* at 161-62.  In connection with the RFC determination, the ALJ agreed with the December 14, 2012 finding of Soraya Amanullah, PhD, a psychological consultant to the Disability Determination Service, that Ms. Schroeder had only moderate difficulties maintaining social functioning and maintaining concentration, persistence, or pace, and that she can perform routine, repetitive work on a sustained basis. *Id.* at 164 (citing *Admin. Tr.* at 231, 237, 244, 250).  The ALJ reasoned that "the mental health treatment records show essentially benign mental status examinations with the claimant provided coping skills to deal with life situations and with improvement in her mental status with medication and therapy." *Id.* (citations to the record omitted).

At step four of the sequential-evaluation process, the ALJ found that given Ms. Schroeder's RFC, she was not capable of performing her past relevant work as an administrative assistant, sales associate, or customer service representative. *Id.* at 165.

At step five, considering Ms. Schroeder's age, education, work experience, and RFC, the ALJ found that there were other jobs—such as bench assembler, mail sorter, and office helper—that exist in significant numbers in the national economy that Ms. Schroeder could perform. *Id.* at 166.

In sum, the ALJ concluded that Ms. Schroeder was not disabled from

August 4, 2012, until the date of the ALJ's decision. *Id.*

## VI. Discussion.

Ms. Schroeder contends that the ALJ erred and that his determination at Step

5 is not supported by substantial evidence.  More specifically, she contends that the

ALJ erred by failing to include in the RFC, and in his hypothetical to the VE, all

the limitations arising from her panic attacks and other mental limitations.  In

connection with this argument, Ms. Schroeder asserts that the ALJ understated the

severity of her mental health conditions.  For example, she criticizes the ALJ's

dismissal of her persistently low GAF scores and his assertion that her mental

status examinations were "essentially benign with little more than an anxious

and/or depressed mood and circumstantial thought processes noted on occasion in

treatment records." *Doc. 17* at 6–9 (quoting *Admin. Tr.* at 160).  She further

contends that the ALJ failed to explain what evidence supported his conclusion

that she improved with appropriate treatment, he ignored probative evidence of her

symptoms, and his "cursory and shallow review of the evidence, particularly as to

[her] ongoing and persistent panic attacks, leads him to reach false conclusions

regarding the severity of her anxiety and its effect on her ability to persist and keep

pace with daily activities." *Doc. 17* at 12.  Ms. Schroeder also contends that the

ALJ erred in how he treated her testimony about the limitations imposed by her mental problems, and, consequently, in formulating her RFC, the ALJ failed to take into account the limitations caused by her panic attacks.

We begin by addressing the ALJ's rejection of much of Ms. Schroeder's testimony about the limitations imposed by her mental health problems on the basis such testimony was not credible.

### A. Credibility Framework.

The court generally defers to the ALJ's assessment of credibility. *Zirnsak v. Colvin*, 777 F.3d 607, 612 (3d Cir. 2014). But "the ALJ must specifically identify and explain what evidence he found not credible and why he found it not credible." *Id*. "An ALJ cannot reject evidence for an incorrect or unsupported reason." *Id*. at 612–13.

The Commissioner's regulations define "symptoms" as the claimant's own description of his or her impairment. 20 C.F.R. § 404.1528(a); 20 C.F.R. § 416.928(a).[10] "A 'symptom' is not," however, "a 'medically determinable physical or mental impairment' and no symptom by itself can establish the

---

[10] Effective March 27, 2017, the definition of "symptoms" was moved to 20 C.F.R. §§ 404.1502(i); 416.902(n).

existence of such an impairment." SSR 96-4p, 1996 WL 374187. The ALJ is required to consider all the symptoms alleged, and when objective medical evidence does not substantiate the symptoms or when conflicts in the evidence exist, the ALJ must decide whether and to what extent a claimant's description of his or her symptoms is credible. 20 C.F.R. §§ 404.1529(a); 416.929(a).[11] In many cases, this determination has a significant impact on the outcome of a claimant's application, because when formulating the claimant's RFC, the ALJ need account for only those symptoms—and the resulting limitations—that are credibly established. *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005).

To facilitate the difficult analysis of evaluating the claimant's symptoms, the Commissioner has devised a two-step process. First, the ALJ must consider whether there is an underlying medically determinable impairment that can be shown by medically acceptable clinical and laboratory diagnostic techniques that could be reasonably expected to produce the symptoms alleged. 20 C.F.R. § 404.1529(b); 20 C.F.R. § 416.929(b). If there is no medically determinable impairment that could reasonably produce the symptoms alleged, then the

---

[11] Sections 404.1529(a) and 416.929(a) were amended effective March 27, 2017. We cite the version that was effective on the date of the ALJ's decision, but the outcome in this case would be the same under the current version of these regulations.

symptoms cannot be found to affect the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1529(b); 416.929(b); SSR 96-7p, 1996 WL 374186.[12]

Second, if there is a medically determinable impairment that could reasonably produce the symptoms alleged, then the ALJ must evaluate the intensity, persistence, and limiting effects of the symptoms that can be reasonably attributed to a medically determinable impairment. 20 C.F.R. §§ 404.1529(c)(1); 416.929(c)(1).[13] Symptoms will be determined to reduce a claimant's functional capacity only to the extent that the alleged limitations and restrictions due to the symptoms can be reasonably accepted as consistent with the objective medical evidence and other evidence of record. 20 C.F.R. §§ 404.1529(c)(4),

---

[12] SSR 96-7p has been superseded by SSR 16-3p. The new ruling eliminates the term "credibility" from the Social Security Administration's policy guidance in order to "clarify that subjective symptom evaluation is not an examination of the individual's character." SSR 16-3p, 2016 WL 1119029 at *1. A comparison of these rulings reveals that there are few substantive changes. Both rulings outline a two-step process to evaluate a claimant's statements about his or her symptoms and both identify the same factors to be considered in the ALJ's assessment of the intensity, persistence, and limiting effects of a claimant's symptoms. Because the ALJ cited to SSR 96-7p, we rely on this ruling as well. Our analysis would not, however, be different under the new ruling.

[13] Sections 404.1529(c)(1) and 416.929(c)(1) were amended effective March 27, 2017. We cite the version that was effective on the date of the ALJ's decision, but the outcome in this case would be the same under the current version of these regulations.

416.929(c)(4).[14]  But an ALJ will not reject statements about the intensity, persistence, or limiting effects of a symptom solely because they are not substantiated by objective evidence. 20 C.F.R. §§404.1529(c)(2), 416.929(c)(2). Instead, the ALJ will "consider all of the evidence presented," and he or she will use the following factors to evaluate the symptoms alleged: the claimant's daily activities; the location, duration, frequency, and intensity of the claimant's pain or other symptoms; any factor that precipitates or aggravates the claimant's pain or other symptoms; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate his or her pain or other symptoms; any treatment, other than medication, the claimant receives or has received for relief of his or her pain or other symptoms; any measures the claimant uses or has used to relieve his or her pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and any other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).[15]

---

[14]  Sections 404.1529(c)(4) and 416.929(c)(4) were amended effective March 27, 2017.  We cite the version that was effective on the date of the ALJ's decision, but the outcome in this case would be the same under the current version of these regulations.

[15]  Sections 404.1529(c)(3) and 416.929(c)(3) were amended effective March 27, 2017.  We cite the version that was effective on the date of the ALJ's decision, but

**B.  The ALJ found Ms. Schroeder not entirely credible.**

Here, the ALJ found that Ms. Schroeder medically determinable

impairments reasonably could be expected to produce her alleged symptoms.

*Admin. Tr.* at 163.  But he found that Ms. Schroeder's allegations regarding the

limiting effects of her conditions were not credible:

> After careful consideration of the evidence, I find that the
> claimant's medically determinable impairments could
> reasonably be expected to cause the alleged symptoms;
> however, the claimant exaggerates her functional limitations
> and I afford her testimony little weight.  She states that she lives
> alone but is considerably helped by her landlord/boyfriend and
> mother.  She testified that she has an exercise bike at home, but
> has not used it in about 6-7 months; yet, Exhibit 12F/32
> indicates that she has used it to exercise.  She says that on
> Mondays she goes grocery shopping and on errands with her
> landlord/boyfriend, but goes early in the day when it is not
> crowded.  The treatment record at Exhibit 12F/43 indicates that
> she went to the supermarket.  The treatment record at Exhibit
> 12F/45 refers to her making plans with BF (i.e.,
> landlord/boyfriend).  The treatment record at Exhibit 12F/47
> notes that she had hopes to go camping soon.  The therapy
> notes at 12F indicate that her therapist keeps encouraging her to
> do things, indicating to me that in the therapist's mind the
> claimant is capable of doing these things, or at least work up to
> them.  But the claimant testified that she does not do these
> things because she doesn't feel like doing so.  In my view, this
> equates to noncompliance without an adequate reason.
> However, she did testify about some things that she has been
> able to do, for example, she went to a Denny's once or twice in
> the recent past, accompanied by her boyfriend.  She went to a

the outcome in this case would be the same under the current version of these
regulations.

beauty salon about 4-5 months ago, accompanied by her boyfriend. She goes at times to the mini-mart near her home to buy cigarettes with her boyfriend. She vacationed in the Poconos with him about 5-6 times in the last year and a half, per her testimony, staying in a cabin he owns, over two- to three-day weekends. The treatment record . . . indicates that she watched the news daily on television for 3-4 hours, which shows concentration and persistence. . . . She describes mood swings, isolating, panic attacks, etc., but was attentive and responsive during the hearing, demonstrating concentration and persistence, and appeared relatively comfortable in the presence of three strangers—me, the hearing reporter, and the vocational expert demonstrating adequate social functioning.

*Id.* (citations to the record omitted).

### C. The ALJ's credibility finding is not supported by substantial evidence.

The ALJ failed to explain adequately his credibility determination and to discuss all the material evidence pertinent to that determination. Thus, we conclude that the ALJ's credibility determination is not supported by substantial evidence.

### 1. The purported inconsistencies in Ms. Schroeder's statements do not provide substantial evidence supporting the ALJ's decision.

The ALJ apparently thought that some of the statements that Ms. Schroeder made to her therapist were inconsistent with her testimony at the hearing. Although the ALJ suggests that Ms. Schroeder's testimony about her use of an

44

exercise bike supports his conclusion that she is not credible, he fails to explain adequately how that is so. Ms. Schroeder testified that she had not used the exercise bike in about six or seven months. *Admin. Tr.* at 189–90. The ALJ, however, pointed to an exhibit that he contends indicates that she had used the bike to exercise. *Id*. at 163 (citing Exhibit 12F/32). That exhibit is a therapy note from August 12, 2013, which provides, among other things, that Ms. Schroeder reported that she rode the exercise bike once the prior week. *Id.* at 782. Ms. Schroeder's testimony at that ALJ hearing was given on February 25, 2014, which was more than six months after that August 12, 2013 therapy note. Thus, contrary to the ALJ's suggestion, her testimony that she had not used the bike in about six or seven months is not inconsistent with the therapy note. And if the ALJ was relying on the therapy note, which shows a one-time use of the bike, for some purpose other than to show an inconsistency between Ms. Schroeder's testimony and the therapy note, he did not explain his reasoning.

Similarly, the ALJ fails to fully explain his contrast between Ms. Schroeder's testimony that she goes grocery shopping on Mondays early in the day with her landlord and a treatment note dated March 25, 2013, that records that Ms. Schroeder "went out one night over the last week to ACME and reports that she was comfortable." *Id*. at 793. It is quite a step to conclude that a one-time trip to

ACME at night shows a material conflict with Ms. Schroeder's testimony, in response to a question from the ALJ asking if she shops for groceries, that she goes grocery shopping early on Mondays with her landlord. Further, the therapy note does not state whether the trip to ACME was alone or with her landlord. And the ALJ does not address that the trip to ACME was something that Ms. Schroeder had been working toward in her therapy. *Id*. at 804 (therapy note from January 21, 2013, providing that Ms. Schroeder hoped to get out and go for a walk or go to the store at night with her boyfriend); *Id*. at 795 (therapy note from March 18, 2013, providing that Ms. Schroeder hoped to start going out with her boyfriend in the evenings starting once a week and working up to four times a week and she hoped to go on walks with him so she would feel more comfortable in the neighborhood); *Cf Larson v. Astrue*, 615 F.3d 744, 752 (7th Cir. 2010) ("[T]he ALJ's conclusion that Larson *accommodated* her fear of going out in public [by going to the grocery store at night] does not discredit her testimony that she *has* a fear of going out in public and gives in to that fear regularly.").

Moreover, while the ALJ cites this one positive therapy note, he does not cite or acknowledge other therapy notes that were consistent with Ms. Schroeder's testimony about her anxiety about leaving the house alone. *See e.g. id.* at 779 (therapy note from September 13, 2013, noting that therapist was working with

Ms. Schroeder on strategies to deal with her anxiety about going places like Walmart and ACME). "An ALJ cannot rely only on the evidence that supports his or her conclusion, but also must explicitly weigh all relevant, probative, and available evidence; and provide some explanation for a rejection of probative evidence which would suggest a contrary disposition." *Voorhees v. Colvin*, 215 F. Supp. 3d 358, 384–85 (M.D. Pa. 2015). The "sort of evaluation, where the evaluator mentions only isolated facts that militate against the finding of disability and ignores much other evidence that points another way, amounts to a 'cherry-picking' of the record which this Court will not abide." *Fanelli v. Colvin*, No. 3:16-CV-1060, 2017 WL 551907, at *9 (M.D. Pa. Feb. 10, 2017).

The ALJ also does not acknowledge that bipolar disorder is episodic. *See Kangail v. Barnhart*, 454 F.3d 627, 629 (7th Cir. 2006) ("[The ALJ] thought the medical witnesses had contradicted themselves when they said the plaintiff's mental illness was severe yet observed that she was behaving pretty normally during her office visits. There was no contradiction; bipolar disorder is episodic."). Nor does he address Ms. Schroeder's testimony that her panic attacks were worse at some times than at other times. In sum, the ALJ has not logically explained how one positive therapy note that shows that Ms. Schroeder went to ACME once at night in March of 2013, conflicts with her testimony at the hearing or otherwise

sheds light on her credibility. And "[a] focus on indicia of Plaintiff's momentary increased functioning to the exclusion of evidence demonstrating impaired functioning goes against the requirement for the ALJ to evaluate all relevant evidence." *Voorhees*, 215 F. Supp. 3d at 386.

In sum, the ALJ's determination that Ms. Schroeder's testimony about the limitations imposed by her mental conditions was not credible because she purportedly made inconsistent statements is not supported by substantial evidence.

### 2. Ms. Schroeder's purported non-compliance does not provide substantial evidence supporting the ALJ's decision.

The ALJ also speculated that because Ms. Schroeder's therapist kept encouraging her to do things, "in the therapist's mind" she was capable of doing those things or working up to them, but because she did not do those things, she was noncompliant. *Admin. Tr.* at 163. "[A]n ALJ may not make speculative conclusions without any supporting evidence." *Burnett*, 220 F.3d at 125. The ALJ's assumption about what was in the therapist's mind was speculation.

Moreover, the ALJ concluded that Ms. Schroeder was noncompliant seemingly without acknowledging that her mental illness may have been the reason for any noncompliance. "Courts have acknowledged that noncompliance with treatment is especially prevalent among patients with bipolar disorder." *Voorhees*,

215 F. Supp. 3d at 381 (citing cases). And "[b]ecause a 'mentally ill claimant's noncompliance can be, and ordinarily is, the result of the mental impairment,' a credibility determination that does not take this factor into consideration is not entitled to deference." *Johnson v. Colvin*, No. 3:16-CV-414, 2016 WL 7034514, at *18 (M.D. Pa. Dec. 2, 2016) (quoting *Watkins v. Astrue*, 414 F. App'x 894, 896 (8th Cir. 2011)).

The ALJ's speculation about what was in the mind of Ms. Schroeder's therapist and his conclusion that Ms. Schroeder failed to comply with treatment recommendations, without considering whether Ms. Schroeder's mental problems contributed to her purported failure to comply, is not supported by substantial evidence.

### 3. Ms. Schroeder's activity level does not provide substantial evidence supporting the ALJ's decision.

The ALJ also found Ms. Schroeder not credible given her activity level. The ALJ failed, however, to explain how the sporadic and transient activities he cited— going to Denny's once or twice, going to a beauty salon four or five months ago, going to the mini-mart with her boyfriend to buy cigarettes, going to a cabin in the Poconos for long weekends five or six times in the last year and half, and watching three to four hours of news daily—were inconsistent with Ms. Schroeder's

testimony about her fear of leaving the house alone, her testimony about her panic attacks, and therapy notes containing her reports of those things.

Moreover, "[i]t is well established that sporadic or transitory activity does not disprove disability." *Smith v. Califano*, 637 F.2d 968, 971–72 (3d Cir. 1981). "Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity." *Id*. at 971. The sporadic and transitory activities cited by the ALJ here do not amount to substantial evidence supporting the ALJ's rejection of Ms. Schroeder's testimony regarding her symptoms. *See Fargnoli v. Massanari*, 247 F.3d 34, 40 n.5 (3d Cir. 2001) (noting that "Fargnoli's trip to Europe in 1988 cannot be the basis for a finding that he is capable of doing a light exertional job because sporadic and transitory activities cannot be used to show an ability to engage in substantial gainful activity"); *Smith*, 637 F.2d at 971 ("shopping for the necessities of life is not a negation of disability"); *Russo v. Colvin*, No. CV 3:16-00859, 2016 WL 6496445, at *5 (M.D. Pa. Nov. 1, 2016) (rejecting the ALJ's reasoning that because Russo retained "the capacity to perform personal care activities, prepare his own meals, wash dishes, shop in stores, and manage money" he had "a greater capacity for sustained physical, cognitive, and social skills than alleged" and his activities suggested that he was "capable of performing work activity on a sustained basis"). Although a

50

claimant's activities of daily living are certainly things that can shed light on a claimant's credibility, here, the ALJ cherry picked from the treatment notes the few activities that Ms. Schroeder reported that she engaged in without acknowledging the other reports that suggested that she did very little or that suggested that what she did varied depending on the severity of her mental conditions at the time.

In sum, the ALJ's determination that Ms. Schroeder's testimony about the limitations imposed by her mental conditions was not credible given her activity level is not supported by substantial evidence.

### 4. The ALJ's observation at the hearing does not provide substantial evidence supporting the ALJ's decision.

The ALJ also rejected Ms. Schroeder's testimony about the limitations caused by her mental health problems based on his observation of her at the hearing reasoning that she was attentive and responsive during the hearing and appeared relatively comfortable. *Id.* at 163. "[T]he ALJ [is] specifically empowered to consider observations of the Plaintiff from the hearing." *Pleacher v. Colvin*, No. 1:13-CV-02756-GBC, 2015 WL 1470662, at *10 (M.D. Pa. Mar. 31, 2015) (citing SSR 96–7p). "Moreover, when the credibility determination is not based only on the ALJ's observations, but also based on a review of the objective

evidence, Courts generally hold that an ALJ has not engaged in [an improper] 'sit and squirm' analysis." *Id*. (quoting *Pfingstler v. Colvin*, No. CIV.A. 13-84E, 2014 WL 811796, at *3 (W.D. Pa. Mar. 3, 2014)). Nevertheless, the Third Circuit has concluded that "an ALJ's personal observations of the claimant 'carry little weight in cases . . . involving medically substantiated psychiatric disability.'" *Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000) (quoting *Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984)).

Here, although the ALJ was permitted to consider his observations of Ms. Schroeder at the hearing, his observation that she was attentive and relatively comfortable is not alone substantial evidence to support an adverse credibility determination or a determination that she can engage in substantial gainful activity. That Ms. Schroeder was able to keep it together for a brief hearing[16] tells little about her credibility or her ability to engage in substantial gainful activity. Again, we note that the ALJ has not acknowledged the episodic nature of bipolar disorder or Ms. Schroeder's testimony that her panic attacks were worse at times.

---

[16] The hearing lasted only a little over an hour—from 8:50 a.m. to 9:55 a.m. *Admin. Tr.* at 173, 226. And only a portion of that time involved Ms. Schroeder's testimony.

## 5. In sum, the ALJ's credibility finding is not supported by substantial evidence.

While the court generally defers to the ALJ's assessment of credibility, "the ALJ must specifically identify and explain what evidence he found not credible and why he found it not credible," and the "ALJ cannot reject evidence for an incorrect or unsupported reason." *Zirnsak*, 777 F.3d at 612–13. And "the ALJ must . . . consider and weigh all of the non-medical evidence before him." *Burnett*, 220 F.3d at 122. Further, "[a]lthough the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence." *Id.* at 121. Thus, the "ALJ may not reject pertinent or probative evidence without explanation." *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 204 (3d Cir. 2008). Otherwise, "'the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'" *Burnett*, 220 F.3d at 121 (quoting *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981)).

The ALJ was not required to reference every treatment note concerning Ms. Schroeder. *See Fargnoli,* 247 F.3d at 42 (stating that when there are voluminous records, the ALJ is not expected to reference every relevant treatment note). But here, the ALJ cherry picked certain therapy notes that favored his conclusion that Ms. Schroeder exaggerated her symptoms without mentioning other therapy notes

that point in the opposite direction.  Because the ALJ relied on statements made by Ms. Schroeder as recorded in the notes of her therapist without addressing such statements that supported Ms. Schroeder's testimony, we do not know whether that ALJ rejected that evidence or merely overlooked it.  Moreover, the ALJ failed to explain adequately how what he suggested were inconsistencies in Ms. Schroeder's statements, her non-compliance with what her therapist encouraged her to do, and her activity level, supported his adverse credibility finding.  And the ALJ's observation of Ms. Schroeder for a short time at the hearing does not provide substantial evidence to support the ALJ's finding.

In sum, we conclude that the ALJ's decision with regard to Ms. Schroeder's subjective symptoms was not supported by substantial evidence.  Accordingly, we recommend that the decision denying Ms. Schroeder's claims be vacated and the case be remanded to the Commissioner.  Given that conclusion, we do not address Ms. Schroeder's remaining arguments that the ALJ's decision was not supported by substantial evidence and that the ALJ committed errors in evaluating the medical evidence. *Russo*, 2016 WL 6496445, at *6 ("We will decline to address Russo's other allegations of error, as remand may produce different results on these claims, making discussion of them moot.").

## VII.  Recommendations.

Accordingly, for the foregoing reasons, **IT IS RECOMMENDED** that the

plaintiff's request for relief be **GRANTED** and the Commissioner's final decision

denying Ms. Schroeder's claims be **VACATED** as follows:

1. This case should be remanded to the Commissioner pursuant to sentence

   four of 42 U.S.C. §405(g); and,

2. Final judgment should be entered in favor of the plaintiff and against the

   Commissioner of Social Security.


The parties are further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a magistrate judge's proposed findings,
> recommendations or report addressing a motion or matter described in
> 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the
> disposition of a prisoner case or a habeas corpus petition within
> fourteen (14) days after being served with a copy thereof. Such party
> shall file with the clerk of court, and serve on the magistrate judge and
> all parties, written objections which shall specifically identify the
> portions of the proposed findings, recommendations or report to which
> objection is made and the basis for such objections. The briefing
> requirements set forth in Local Rule 72.2 shall apply. A judge shall
> make a de novo determination of those portions of the report or
> specified  proposed findings or recommendations to which objection is
> made and may accept, reject, or modify, in whole or in part, the
> findings or recommendations made by the magistrate judge. The judge,
> however, need conduct a new hearing only in his or her discretion or
> where required by law, and may consider the record developed before
> the magistrate judge, making his or her own determination on the basis
> of that record. The judge may also receive further evidence, recall

witnesses or recommit the matter to the magistrate judge with instructions.

Submitted September 5, 2017.

*__S/Susan E. Schwab__*
Susan E. Schwab
Chief United States Magistrate Judge